UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



KOLMAR AMERICAS INC.,

               Plaintiff,

       -against-

MYCONE DENTAL SUPPLY CO., INC.,

            Defendant.

No. 21-cv-02361 (CM)

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

McMahon, J.:

    Defendant has moved to dismiss the complaint in this action, which alleges that it breached a contract to purchase ethanol from Plaintiff. Because, even interpreting the allegations of the complaint most favorably to Plaintiff, there was no such contract, Defendant's motion is GRANTED.

## BACKGROUND

    Plaintiff Kolmar Americas, Inc. ("Kolmar" or "Plaintiff") is a petroleum commodities trader. It engaged in negotiations for the sale of goods – specially, ethanol – with Defendant Mycone Dental Supply Co., Inc., which does business under the name Keystone Industries ("Keystone" or "Defendant").

    The parties began their discussions via email in August 2020, looking toward a deal pursuant to which Kolmar was to supply Keystone with ethanol for the 2021 calendar year. As set forth in the complaint, this email exchange extended through early September of 2020. Kolmar alleges that the emails evidence a binding agreement. Keystone disagrees.

Facts

The following facts are taken from the complaint and its exhibits. For the purposes of this motion they are presumed to be true.

Kolmar made Keystone a firm offer to sell Defendant ethanol in an email dated August 17, 2020. (Complaint filed in *Kolmar Americas Inc. v. Mycone Dental Supply CO., Inc.*, 21-cv-02361, dated March 18, 2021, Docket No. 1 (the "Complaint" or "Compl."), ¶ 9). That email said "Please see our indicative offer for the supply of ethanol to Keystone for 2021, with validity through Thursday August 20th. We look forward to the opportunity to supply ethanol to Keystone as your sanitizer business grows." (Compl., Ex. A).

On August 20, 2020, Keystone responded to Kolmar's email as follows: "We are still developing our forecast for 2021 so would need to have some flexibility in the volume requirements. Would it be possible to put a range into the contract of between 3 – 6 trucks per week? I foresee that the volumes will build during the year but there is some uncertainty on the timing for the build. I am confident in the 3 per week. Please let me know if this is acceptable and then we can start working on specifics and key information. Look forward to working together to move this forward." (Compl., Ex. B).

On August 21, 2020 Kolmar responded with a second "firm offer" that allegedly included all material terms. (Compl. ¶ 11). Kolmar wrote, "Based on your feedback please find below a recap of what we can agree to which we think also satisfies the considerations you expressed. Please let us know by Monday US opening that this works for you. Upon timely receipt of your confirmation this agreement would still be subject to seller concluding successful KYC by Friday 28th August." (Compl., Ex. C). The "recap" attached is a chart summarizing the contemplated terms of the transaction, including: product specifications, delivery term/period, price per gallon,

delivery location, delivery notice requirement, delivery mode, inspection terms, quality and quantity determination method, payment terms, credit terms, and choice of law and jurisdiction terms. (*Id*. at p. 2-3.)

On August 26, 2020 Keystone emailed Kolmar, confirming Keystone's intention to proceed with the August 21 offer, but conditioned on Kolmar's signing Keystone's quality agreement. (Compl. ¶ 12). Keystone wrote, "I wanted to confirm with you that we will proceed with your offer for ethanol supply for 2021. Brian from our purchasing team will be working with your team to complete all the necessary information for supply. We will also need you to sign our quality agreement as well." (Compl., Ex. D).

On September 2, 2020 Kolmar emailed Keystone a marked-up copy of Keystone's quality agreement and an "updated recap" – the chart detailing the terms of the transaction. Kolmar's mark-up of the quality assurance form crossed out multiple clauses, including the obligation to maintain a quality system in conformance with the FDA's good manufacturing practice requirements, and the obligation to provide quality control and/or specification information as needed for Keystone to meet regulatory requirements. (Compl., Ex. E at 8-9). The updated recap differed from its predecessor in one important respect: instead of saying that payment was due "As per Kolmar's Credit Department's requirements," (Compl. Ex. C), it said that "prepayment" was required. (Compl., Ex. E).

Keystone did not respond to this communication.

On September 10, 2020, Kolmar emailed Keystone a thirteen page, singled-spaced, unsigned Term Agreement, which, according to the cover message, purported to memorialize the deal between the parties for the sale of ethanol (the "Term Agreement") (Compl. ¶ 17; Compl. Ex. F). The Term Agreement introduced new terms that had never before been proposed to Keystone,

including finance charges, security interest assignments, exclusions of warranties, title transfer and risk of loss provisions, statutes of limitations, tax responsibilities, limitations of liabilities, and confidentiality obligations. *Id.* Moreover, the Term Agreement did not incorporate Keystone's quality assurance form. And the Term Agreement provided that "Section 1 - Commercial Terms and Conditions ('Section 1') and the other terms and conditions as described in Section 2 - other Terms and Conditions ('Section 2'), together represent the entire understanding between the Parties and may not be contradicted by evidence of any prior agreement or of a contemporaneous agreement." *Id.* at 3.

Again, Keystone did not respond to the email, Neither party ever signed the Term Agreement.

On September 16 representatives of Plaintiff and Defendant spoke by telephone. The Keystone trader asked Kolmar's trader for a lower price in-light of a drop in the market price for ethanol. Kolmar's trader responded, "the agreement was already concluded." (Compl. ¶ 20) and demanded adequate assurance of Keystone's intention to perform under the Term Agreement. (Compl. ¶¶ 21-22).

On October 14, 2020, Keystone emailed Kolmar stating, "Sorry for the slow response in reviewing the contract but Keystone has decided not to proceed with this contract." (Compl. ¶ 23, Ex. H).

Kolmar responded to Keystone's email the next day, asserting that Kolmar was terminating the purported agreement in light of Keystone's anticipatory breach, while reserving its right to "hold Keystone liable for all damages." (Compl. ¶ 24).

According to Kolmar, Keystone's October 14 email stating that Keystone "decided not to proceed with this contract" confirmed that the parties had already entered a binding contract, and

therefore constituted an anticipatory breach. (Compl. ¶ 25). Kolmar further alleges that Keystone's refusal to provide adequate assurance of performance constituted a repudiation of the contract or an anticipatory breach of the agreement, entitling Kolmar to damages.  (Compl. ¶¶ 26-27).

The New York State Court Action

On October 28, 2020, Kolmar commenced an action against Keystone in Supreme Court, New York County for breach of contract and breach of the implied covenant of good faith and fair dealing (the "State Action"). (Exhibit 1 of Defendant's Memorandum of Law in Support of its Motion to Dismiss, ("Mot."), Dkt. No. 8). The State Complaint is substantially identical to the Complaint before this Court insofar as it alleges breach of contract; in the federal Complaint, there is no separate cause of action for breach of the implied covenant of good faith and fair dealing.

Keystone moved to dismiss State Action, and on February 23, 2021, the Honorable Barry R. Ostrager granted that motion, albeit without prejudice and with "leave to file a pleading that alleges with specificity what the material terms are" of an alleged oral agreement. (Mot., Ex. 6) (attaching Notice of Entry of Justice Ostrager's Order Granting Defendant's Motion to Dismiss the Complaint in *Kolmar Americas, Inc. v. Mycone Dental Supply Co.*, 0655781/2020 (Feb. 23, 2021)) (the "State Order"). The State Complaint did not specifically allege an oral or a written agreement; instead, the State Complaint alleges that the parties entered a binding "commodity purchase and sale agreement" via email, which was memorialized by the Term Agreement. (Mot., Ex. 1 ¶¶ 1, 12).  Justice Ostrager pointed out that the Term Agreement was prepared by Kolmar and contains terms that conflict with Keystone's quality assurance form, to which Kolmar made changes that Keystone never accepted.  "Notwithstanding the liberal construction that courts must give to a complaint on a motion to dismiss," Justice Ostrager held that the court could not agree

that the 13-page, singled space Term Agreement, which was both unsigned and "internally inconsistent," constituted a binding contract.  (State Order at 1).

Kolmar did not accept Justice Ostrager's invitation to file an amended pleading in the State Action and to allege the existence of an oral agreement, as opposed to a written agreement. Instead, it initiated this action against Keystone for breach of a written contract allegedly created by the email exchange and ultimately memorialized in the unsigned Term Agreement.

## DISCUSSION

Keystone moves to dismiss the instant action on three separate grounds: (i) this Court should abstain from deciding this case pursuant to the *Colorado River* doctrine; (ii) Kolmar's claims are precluded by the State Order granting Keystone's motion to dismiss a substantially similar complaint; and (iii) Kolmar fails to state a claim for breach of contract.

Because Kolmar's third and last argument – failure to state a claim for breach for contract – is manifestly correct, Keystone's motion is GRANTED.

I.   *Colorado River* Abstention Would Be Inappropriate In this Case

Keystone first asks the Court to abstain from exercising jurisdiction over this case pursuant to *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976).

In *Colorado River,* the Supreme Court held that federal court – albeit only in exceptional circumstances – could dismiss an action pending before it "due to the presence of a concurrent state proceeding for reasons of wise judicial administration." *Colorado River*, 424 U.S. at *818. Whether to abstain lies within the discretion of the Court.

In analyzing whether 'exceptional circumstances' warrant abstention, the Second Circuit cautions that the balance is heavily weighted in favor of the exercise of jurisdiction. *Aventura*

*Techs. Inc. v. World of Residensea II Ltd.*, 646 F. App'x 92, 94 (2d Cir. 2016).  And as Keystone correctly notes, the Court must first make a threshold determination that the federal and state court cases are indeed both "parallel" and "concurrent" – that is, when the parties are litigating substantially the same issues at the same time in both state and federal court.  *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998).

Here, there is no contemporaneous parallel state court proceeding. Justice Ostrager dismissed Kolmar's state court action on February 23, 2021.  While Justice Ostrager dismissed the state court complaint without prejudice, he required that Kolmar move to *restore* the case to that court's calendar in order to replead its claim.  It has been ten months since the State Action was dismissed and Kolmar has not moved to restore that case before Judge Ostrager. There is, therefore, no litigation pending in the state court.

Relying on *Wiggin & Co. v. Ampton Invs., Inc.*, 66 F. Supp. 2d 549 (S.D.N.Y. 1999), Keystone argues that because the state court action was dismissed without prejudice, there is still a pending state action. But that is ridiculous. The case was dismissed – it is no longer on the court's calendar. Kolmar had to do something affirmative in order to resuscitate the state court action – something it has not done.

Moreover, in *Wiggin*, my late colleague Judge Sweet found that the *Colorado River* threshold was met, notwithstanding a dismissal without prejudice, because the state court had dismissed only one of two claims, and the claim that survived dismissal was identical to the claim before the federal court. *Wiggin*, 66 F. Supp. 2d at 552. There was, therefore, a contemporaneous parallel state lawsuit on exactly the same claim. Here there is no remaining claim pending. *Wiggin* can also be distinguished from this case because the state court dismissed the one claim without

prejudice because of a technical defect in the pleadings – not, as Justice Ostrager did, because Kolmar failed to allege the existence of a binding contract.

Moreover, in *Wiggin*, the plaintiff indicated that it had every intention of filing an amended complaint. *Id.* Nothing in the facts of this case suggests that Kolmar intends to replead its claim in state court on the alternate theory (specifically alleging an oral contract) suggested by Justice Ostrager. The fact that ten months have passed and that Kolmar elected to filed this lawsuit rather than proceed in New York State Supreme Court is enough to establish that.

There is, therefore, no basis whatever for *Colorado River* abstention, and so no reason for this court not to exercise jurisdiction over this lawsuit.

II.    The Order Dismissing the State Action Does Not Preclude Kolmar's Claim

Keystone next moves to dismiss the complaint on the grounds that Kolmar's claim is precluded by State Order.

The doctrine of claim preclusion, also known as res judicata, limits repetitious suits, establishes certainty in legal relations, and preserves judicial economy. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). The doctrine applies in a later litigation if an earlier decision (i) was a final judgment on the merits; (ii) decided by a court of competent jurisdiction; (iii) involved the same parties or their privies; and (iv) involved the same cause of action. *In re Adelphia Recovery Trust*, 634 F.3d 678, 694 (2d Cir. 2011). "A federal court must give to a state-court judgment the same preclusive effect as it would be given that judgment under the law of the State in which the judgment was rendered." *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 265 (2d Cir. 1997) (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896 (1984)).

The former adjudication analysis hinges on whether Justice Ostrager's decision constitutes a final judgment on the merits. Kolmar argues that because Justice Ostrager dismissed the State Court Action without prejudice, it is not a final judgment on the merits and therefore has no preclusive effect on Kolmar's instant action before this Court. Keystone, however, contends that because Justice Ostrager declined to allow the plaintiff to replead its original contract theory and permitted it to go forward only on an oral contract theory (which Kolmar has never embraced), the dismissal of the precise claim being asserted in this court was "with prejudice."

It is well established in the Second Circuit that a dismissal without prejudice has no preclusive effect on a subsequent claim. *Camarano v. Irvin*, 98 F.3d 44, 47 (2d Cir. 1996). In deciding whether the petitioner was precluded from filing a second habeas petition after his first petition was dismissed without prejudice for failure to exhaust state remedies, the *Camarano* court relied on the jurisprudence of claim preclusion for the proposition that a dismissal without prejudice can have no preclusive effect. *Id.* at *47. The phrase "without prejudice" would be devoid of its meaning under any other construction. *Id.*

This case presents an unusual set of facts. Ordinarily, Justice Ostrager's use of the phrase "without prejudice" would fall within that well-settled rule. The fact that he announced in advance that he would not entertain Kolmar's original theory of the case – which happens to be the theory propounded in this court – does, however, suggest that his dismissal of the original complaint was intended to have some "with prejudice" aspect to it. In light of Justice Ostrager's decision only to permit repleading on an oral contract theory, I can well understand Keystone's argument.

However, I can cut this Gordian knot without deciding the issue, because, on the facts pleaded, there was no contract to breach. On that question, I reach exactly the same conclusion as Justice Ostrager.

III.    Kolmar Fails to State a Claim for Breach of Contract

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Such facial plausibility requires plaintiffs to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Where plaintiffs fail to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. It should be noted, however, that Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

New York contract law governs the underlying claim for breach of contract.  To state a breach of contract claim under New York law, a plaintiff must allege (i) the existence of an agreement; (ii) adequate performance by the plaintiff; (iii) breach by the defendant; and (iv) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir.2011).

To plead the first element of a breach of contract claim – the existence of an agreement – Kolmar must allege a "meeting of the minds" and a "manifestation of mutual assent" that is "sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" as to form a binding, enforceable contract. *Reliable Automatic Sprinkler Co. Inc. v. Sunbelt Grp. L.P.*, 472 F. Supp. 3d 64, 72 (S.D.N.Y. 2020) (quoting *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (N.Y. 2016)).

Even viewing the facts alleged in the Complaint and its attached exhibits in the light most favorable to Kolmar, Plaintiff has not plausibly alleged that any enforceable agreement between

Kolmar and Keystone exists. For that reason, its claim for breach of contract must be dismissed – and this time, with prejudice.

Kolmar's theory of contract formation is that the email communications evidence a meeting of the minds, thereby creating a binding contract -- and that the unsigned Term Agreement simply memorializes an agreement that was already made. The Court must determine whether the pleaded facts, presumed to be true, demonstrate offer, acceptance, and the parties' intent to be bound as a matter of law.

They do not.

Kolmar argues that Keystone's August 26 email – the one in which Keystone said it would "proceed" with Kolmar's August 21 offer – constituted acceptance of that offer and so formed a binding contract. (Compl. ¶ 12). But in that same August 26 email to Kolmar, Keystone unequivocally stated that Kolmar needed to sign the Keystone's quality assurance form before Keystone would proceed with any contract. So, while the August 26 email evidences Keystone's intention to accept, that acceptance was *conditioned* on Kolmar's signing the quality assurance form. As a matter of law, that conditional acceptance does not create a binding contract.

Conditional acceptance operates as a rejection or, at most, a counteroffer. Under New York law, "a proposal to accept the offer. . .. subject to other conditions" is equivalent to a rejection of that offer. *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (citing *Poel v. Brunswick–Balke–Collender Co.*, 216 N.Y. 310, 319 (1915)). Keystone's August 26 email does not constitute acceptance of the August 21 offer; rather, it is, at best, a counteroffer – one that Kolmar did not accept by signing the proffered quality assurance form. Instead, in its September 2 response – a response that Kolmar describes as a "confirmation" (Compl. ¶ 13) – Kolmar marked up the form. It did not agree to Keystone's counteroffer as made; it initiated further negotiation

over the terms of that quality assurance document. Kolmar made "applicable changes, notations, and responses" to the form before signing it and sending it back to Keystone in the September 2 email. (Compl. ¶ 14; Compl. Ex. E). But Keystone had not indicated that it was open to "applicable changes, notations and responses;" it demanded that its quality assurance form be signed. Kolmar was obviously not willing to do that. There could be no clearer evidence that the parties had not agreed on a final and binding contract prior to September 2.

In its September 2 email, Kolmar also added a new prepayment obligation. (Compl. ¶ 14; Compl. Ex. E). No allegation in the complaint would support a finding that Keystone ever agreed to prepayment term. Kolmar's August 21 offer contained no such term; and according to Kolmar, it was the August 21 offer that Keystone allegedly accepted. The prepayment obligation first proposed in Kolmar's September 2 email constitutes a material term; indeed, terms of payment are the paradigmatic example of a material contract term. *S.E.C. v. Rorech*, 720, F. Supp. 2d 367, 408 (S.D.N.Y. 2010). Kolmar thus fails to allege that the parties ever agreed upon *all* material terms of their arrangement.

On September 10, 2020, Kolmar sent Keystone the unsigned Term Agreement as a written confirmation of the agreement the parties had allegedly reached. (Compl. ¶ 17, Ex. F). Casting further doubt on Kolmar's insistence that the parties had reached an agreement on all material terms, the Term Sheet further modified the terms from those laid out in Kolmar's August 21 offer. The additional terms (which appear for the first time, in the Term Sheet on September 10) include finance charges, security interest assignments, exclusions of warranties, title transfer and risk of loss provisions, statutes of limitations, tax responsibilities, limitations of liabilities, and confidentiality obligations. *Id.*

Keystone points to the fact that neither Kolmar nor Keystone ever signed the Term Sheet as evidence that the parties did not intend to be bound. Of course, that fact is not always determinative; under New York law, parties are free to enter into a binding contract without committing their agreement to a fully executed writing, even if they contemplate memorializing the contract with a subsequently signed document. *Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 617 (S.D.N.Y. 2009). But in this case no facts are alleged that would tend to show that the parties had any such understanding. Therefore, the fact that the Term Agreement was never signed is indeed further evidence that the parties had not reached agreement on all material terms in their earlier email exchange.

Kolmar argues that the additional obligations first found in the Term Agreement are to be construed as proposals that became part of the originally-agreed contract when Keystone failed to object, pursuant to the "merchant's exception" found in § 2-201(2) of the Uniform Commercial Code. According to Kolmar, the new terms set forth in the unsigned Term Agreement are binding additions to the agreement because the agreement was one for the sale of goods, and Keystone failed to object to it within a reasonable time. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Opp."), Dkt. No 11 at 9-10).

Justice Ostrager explained cogently why this argument fails:

> "Notwithstanding the liberal construction that courts must give to a complaint on a motion to dismiss, a claim for damages in an amount that is not less than $3,903,900 cannot, under any construction of UCC Section 2-201(2), the so-called 'merchant's exception' to the statute of frauds, accept the unsigned 13-page single spaced, internally inconsistent 'term agreement' as potentially constituting a binding contract."

(Mot., Ex. 5) (Justice Ostrager's State Order granting Keystone's motion to dismiss the State Complaint).

Kolmar next argues that the parties reached a binding agreement because contract formation does not require every contractual term to be spelled out, or even included at all; a failure

to articulate all terms does not prevent the formation of a contract. *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 471, 471 (E.D.N.Y. 2012).

But while it is true that "the fact that one or more terms are left to be agreed upon" will not "defeat an otherwise adequate agreement." *Id.* (quoting U.C.C. § 2–204(3), Off. Cmt. 3), there is no "otherwise adequate agreement" in this case. As a result, *Dell's Maraschino* is easily distinguishable. There, the court rejected the argument that no contract existed simply because the written contract for the sale of goods, (which had been signed by all parties) was silent on certain terms, such as whether the plaintiff had to provide shipping containers. *Id.* This is not a case about missing terms appurtenant to a signed contract; it is a case in which there is no signed contract and no way to construe the parties' communications as evidencing an intent to be bound on Keystone's part or as indicating agreement on all material terms, including specifically payment. Additionally, the conduct of the parties in *Dell Maraschino* demonstrated their intent to be bound: the plaintiff picked up the first shipment of cherries under the contract, and the defendant made cherries available to the plaintiff for further shipments. *Id.* But the parties to this case did not initiate performance or otherwise indicate by their conduct an intent to be bound.

Finally, Kolmar argues that "the materiality of a term is a question of fact" and is therefore not appropriate to consider at the motion to dismiss stage. But Kolmar's reliance for this point on *ICC Chem. Corp. v. Vitol, Inc.*, 425 F. App'x 57, 59 (2d Cir. 2011) is misplaced. The parties in *ICC Chem. Corp.* did not dispute that they had originally entered into a contract. *Id.* Rather, the parties disagreed about whether the proposed addition to the contract – an arbitration provision – became part of the contract under the merchant's exception. *Id.* That analysis turned on whether the arbitration provision materially altered the agreement the between parties, which presented a question of fact. *Id.* Here, as I have said over and over again, Keystone denies ever having entered

into an agreement with Kolmar; and the parties' communications indicate that they never agreed on such material terms as the terms of payment, *i.e.*, whether Keystone was obligated to prepay for trucks of ethanol, and on a final quality assurance agreement.

Essentially Kolmar argues that the question of whether there was a meeting of the minds sufficient to constitute a contract is one of fact that should not be decided on a motion to dismiss. (Opp. 14-15).

Kolmar is incorrect.  To survive a motion to dismiss, a plaintiff must allege facts from which a trier could plausibly infer that there was a meeting of the minds. Kolmar has not met that burden. Per the communications attached to Kolmar's own Complaint, the parties did not reach a meeting of the minds as to the material terms of the contract.  The facts alleged –especially (1) Keystone's conditioning its acceptance of Kolmar's August 21 offer on Kolmar's signing a quality assurance form, which rendered what Kolmar call an "acceptance" a "rejection and counteroffer" as a matter of law, and (2) Kolmar's trying to start negotiating the terms of that form, while simultaneously changing the payment term from the one it proposed on August 21 – admit of but one inference: the parties never reached agreement on all material terms of a deal, so there was no deal. That alone is enough to find that the parties never reached a binding agreement as a matter of law.  And as this court held in *Palatkevich v. Choupak*, 2014 WL 1509236, at *23 (S.D.N.Y. Jan. 24, 2014), one cannot breach a contract into which he has not entered.


**CONCLUSION**

For the reasons discussed above, Defendant's motion to dismiss is GRANTED. This constitutes the decision and order of the court. It is a written opinion. The Clerk of Court is respectfully directed to terminate the motion at Docket No. 7.

Dated: November 1, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL